## Cahill v. Adams & Sullivan.

(Decided October 16, 1917.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Waters and Water Courses—Measure of Damages for Obstructing.—Where the lower proprietor, by the erection of a dam across a natural outlet of water, so obstructs or interferes with the ordinary flow of water as to injure the upper or adjacent owners, he is liable in damages for the injuries so sustained.

2. Contracts—Sub-contractor—Substitution of Parties—When Action by Contractor for Damages Against Sub-contractor Will Not Lie. —Where a city entered into a contract with "C" to improve a water course, and "C" let a part of the work to "A & S" under a contract providing that "A & S" would be responsible to "C" for any damages the city might recover against "C" for the failure of "A & S" to do the work according to contract, "C" could not maintain an action against "A & S" for a breach of the contract until the city had sought to make him liable.

WILLIAM FURLONG for appellant.

DALLAM, FARNSLEY & MEANS for appellees.

Opinion of the Court by Judge Carroll—Affirming.

In 1913 the city of Louisville ordered the improvement of Beargrass creek from Baxter avenue to Kentucky street. The work contemplated consisted of straightening the channel and enclosing it with concrete bottom and concrete walls, and this required consider-

able excavation and blasting. The plans and specifications divided the work into three sections designated as section "E," extending from Baxter avenue to Broadway; section "F," extending from Broadway to Breckinridge street; and section "G," extending from Breckinridge to Kentucky streets. The contract for the three sections was let to Cahill, the appellant, and he afterwards sublet section "F," which was the middle section, to the appellees, Adams & Sullivan, Cahill retaining the contract to do the work required on sections "E" and "G." The contract entered into between the city and Cahill provided that the work on all three of the sections should be completed on or before April 1, 1915, and this contract was made a part of the contract between Cahill and Adams & Sullivan; or, in other words, Adams & Sullivan in their contract with Cahill agreed to perform all the stipulations and conditions in the contract between the city and Cahill.

It appears that Cahill finished the work on sections "E" and "G" and it was ready for acceptance by the city on April 1, 1915, the time specified in the contract. But Adams & Sullivan did not complete section "F" until August 6, 1915, four months after it should have been completed according to the terms of the contract, and the city would not accept any of the work until all of it had been completed; so that sections "E" and "G" were not accepted until August 6, 1915.

Under the contract the city required Cahill to execute a bond for the performance of the contract, and the original bond executed by him expired on April 1, 1915, as that was the time fixed for the completion of the work, but as the section sublet to Adams & Sullivan was not completed until August, 1915, it became necessary that Cahill should execute a new bond, for which he was required to and did pay $609.66.

The contract further provided that during the progress of the work the contractor should be paid 90% monthly, the remaining 10% being withheld by the city until the whole work was completed and accepted. It further appears that the 10% retained on account of sections "E" and "G" was $22,455.40, and this sum, which would have been paid to Cahill on April 1, 1915, if all of the work had then been completed, was not paid to him until August 6, 1915, when the work on section "F" was finished and the whole contract completed and accepted.

After the work had been completed Adams & Sullivan brought this suit against Cahill seeking to recover from him $3,204.32, being the amount of the 10% retained on account of the work done on section "F." They also sought to recover $525.42, interest which they alleged was wrongfully retained by Cahill. They further set up that section "E" constructed by Cahill was adjacent to and down the stream from section "F" constructed by them, and that on the boundary line between the two sections, "F" and "E," Cahill put a dam across the creek so that the water of the creek was dammed up and held back, and the debris—rocks, mud, sewage and trash of every kind that came down the creek from points above—was stopped by the dam, and the water and this debris would back up on section "F," and in consequence of this they were compelled to and did, in performing the contract for the improvement of section "F," remove the water and debris that had been thrown up on section "F" by this dam at a cost to them of $5,182.00. They further claimed other damages in the sum of several thousand dollars.

In his answer, after controverting the averments of the petition, Cahill, by way of counter-claim, sought to recover from Adams & Sullivan the interest on $22,455.40 for four months, amounting to $449.10, and $609.66, the amount paid as premium on bond from April to August.

On a trial of the case before a jury there was a verdict and judgment against Cahill on his counter-claim and in favor of Adams & Sullivan for $4,061.65. This judgment was based on the verdict which allowed Adams & Sullivan $500.00 damages caused by obstructions due to the dam, $3,466.65 admitted to be due by Cahill, and $95.00 on account of a claim growing out of a boiler.

On this appeal by Cahill he complains only of three items: (1) The allowance by the jury of $500.00 on account of the construction of the dam across the creek at the junction of sections "E" and "F"; (2) the failure to allow him the additional premium that he was required to pay for the bond, namely, $609.66; and (3) the loss of interest on 10% retained from April 1st to August 6th, amounting to $449.10.

On the subject of the dam, the court instructed the jury that if they believed from the evidence that the dam constructed by Cahill across Beargrass creek interrupted and retarded the waters usually flowing in

Beargrass creek, and backed them up over the part of the work in Beargrass creek which the plaintiffs were constructing, and thereby caused earth and other material coming down the stream to collect and deposit on the work being prosecuted by the plaintiffs, and retarded the water from passing off of section "E" and down through the channel of Beargrass creek, and that the plaintiffs were thereby injured or damaged either in the cost of additional pumping or in excavating and removing detritus and soil brought down by said stream and retained by said dam, if any such there was, then the law as to this item of claim was for the plaintiffs and the jury should so find and award the plaintiffs such sum in damages as they believed from the evidence would fairly and reasonably compensate plaintiffs for the cost of such additional pumping, if any, not exceeding $2,000.00, and such additional excavating, if any, not exceeding $3,182.00.

And also instructed them that if they believed from the evidence that Adams & Sullivan were injured by deposits of dirt and detritus on their work, and the flooding thereof by water, but further believed that the said deposits of dirt and detritus and said flooding were caused by freshets in Beargrass creek which raised the water over and above the dam mentioned in the first instruction, and that this was the injury complained of, they should find for Cahill.

On the subject of the extra premium on the bond and the interest on the $22,455.40 retained, the court instructed the jury that they should find for the defendant on his counter-claim the sum of $609.66, the amount of the extra premium paid by him on his surety bond, and the further sum of $449.10, being interest on $22,-455.40, the retained percentage on sections "E" and "G," unless they believed from the evidence that the delay of Adams & Sullivan in completing said work on section "F" within the time limited by the contract was caused and brought about by the failure of the city of Louisville to furnish said Adams & Sullivan part of the detail plans to be used by them in the performance of said work in time to complete same within the time limit of the contract, and that but for such failure, if any there was, they would have completed said work on time, in which latter event they should find against the defendant, Cahill, as to these two claims.

Taking up first the question as to the dam, we find no fault with the instructions on the subject of the liability of Cahill growing out of the erection of the dam. The evidence upon the subject of the obstruction to the ordinary flow of water caused by this dam, and the damage sustained by Adams & Sullivan on account thereof, was very conflicting, but the decision of this issue of fact was with the jury. It is argued by counsel for Cahill that a good part, if not all, of the damage sustained by Adams & Sullivan was caused by the manner in which they excavated section "F" in not beginning their excavation at the right place on the section, and by throwing up dirt and material in the middle of the channel so that the water was forced to seek an outlet in narrow spaces left on the sides of the channel. But they had the right, as we think, to do the work of excavation in their own way, and, plainly, the fact that they left only narrow spaces for the flow of water in the channel did not increase the volume of water. The real issue for the jury upon the subject of the obstruction caused by this dam was clearly submitted in the instruction telling the jury that they should not find for Adams & Sullivan unless they believed from the evidence that the dam constructed by Cahill interrupted and retarded the water usually flowing in the creek, causing it to back up over the work which the plaintiffs were constructing; and, further, that Cahill was not liable for any damage caused by freshets in the creek which raised the water over the dam.

It has been settled by numerous opinions of this court that a person who, by the erection of a dam across a natural outlet of water, so obstructs or interferes with the ordinary flow of the water as to injure upper or adjacent owners, is liable in damages for the injuries so sustained, and this principle of law was embodied in the instructions given: Pickerill v. City of Louisville, 125 Ky. 213; Madisonville, etc., R. R. Co. v. Thomas, 140 Ky. 143; Madisonville, etc., R. R. Co. v. Kittinger, 143 Ky. 643.

The contentions of counsel for Cahill, that the court erred in the instruction on the subject of the bond premium and interest on the ten per cent. retained, may be considered together, as they involve the same question of law. It may be conceded, and in fact there is no dispute about it, that Cahill, on account of the failure of Adams & Sullivan to complete section "F" on April 1,

1915, sustained a loss occasioned by the new bond he was required to execute as well as a loss growing out of his failure to get the ten per cent. retained by the city until the completion of the work. But the decisive question remains, were Adams & Sullivan legally liable to Cahill for the loss so suffered?

In disposing of this question it will help to notice the contract between Cahill and Adams & Sullivan, in which it was stipulated, among other things, that "All of the terms, limitations, conditions, restrictions, penalties, time limit, and method of procedure in executing said work as set forth in said contract between the city of Louisville and said Cahill shall apply and are made a part hereof, the same as if fully set forth herein; it being the object and intention of this contract to wholly and completely substitute the second parties, Adams & Sullivan, for the first party, Cahill, in the execution and completion of said contract, and they expressly assume any and all the liabilities, risks, claims, damages, penalties and conditions arising on and pertaining to said section "F," for which the first party should be liable for causes hereafter arising. . . . .

"Second parties agree to execute said work according to said plans and specifications and within the time limit therein provided for, and upon the failure to do so, they agree and bind themselves to pay the first party whatever penalty or liquidated damages and claims should be charged against him by the city of Louisville by reason of any such default."

It will be noticed from these conditions in the contract that as between these parties Adams & Sullivan were substituted for Cahill in his contract with the city. In other words, they took the place of Cahill and assumed all liabilities, damages and penalties that the city could have exacted from Cahill, and they further agreed to pay to Cahill whatever penalties or damages or claims should be charged against him by the city of Louisville on account of their failure to complete the work according to and within the time fixed in the plans and specifications.

It therefore seems to us that as the city did not assert any claim for damages or penalties against Cahill on account of the failure of Adams & Sullivan to complete the work within the time specified, for which failure Cahill was liable to the city, Cahill could not assert any claim for damages or penalties against Adams & Sulli-

van, because his right to damages or penalties against them for failure to complete the work could arise only when the city sought to exact damages or penalties from him on account of such failure. Adams & Sullivan did not agree in their contract to pay to Cahill any damages or penalties, but only to indemnify him against any damages or penalties that the city might compel him to pay. Having this view of the matter, we think the court might well have taken the issues in respect to the bond premium and interest from the jury.

Perceiving no error in the record prejudicial to the substantial rights of Cahill, the judgment is affirmed.